**United States District Court**
For the Northern District of California

1
2
3
4
5                   UNITED STATES DISTRICT COURT
6                   NORTHERN DISTRICT OF CALIFORNIA
7
8    PHUONG DANH,                        Case No. C-05-5192 JCS
9            Plaintiff,                  **ORDER GRANTING PLAINTIFF'S MOTION
                                         FOR SUMMARY JUDGMENT, DENYING
10       v.                              DEFENDANT'S CROSS-MOTION FOR
                                         SUMMARY JUDGMENT AND REMANDING
11   MICHAEL J. ASTRUE,                  FOR AWARD OF BENEFITS
     Commissioner of Social Security,    [Docket Nos. 18, 19]**
12
             Defendant.
13   _____/

14   **I.    INTRODUCTION**

15        Plaintiff, Phuong Danh, filed a complaint on December 15, 2005, seeking review of the final

16   decision of the Commissioner of the Social Security Administration ("Commissioner")[1] denying his

17   application for supplemental security income ("SSI") benefits under Title XVI of the Social Security

18   Act.  Plaintiff asks the Court to reverse the Commissioner's denial of SSI benefits and remand with

19   instructions to award benefits or, in the alternative, to remand for further administrative proceedings.

20        Plaintiff applied for SSI benefits on August 13, 2002.  Administrative Record ("AR") at 65-

21   68.  The application was denied initially and on reconsideration.  Plaintiff requested reopening of the

22   reconsideration determination on July 30, 2003, based on new evidence, namely, medical records

23   from Plaintiff's treating physician, Dr. Sachi Inoue.  AR at 37.  The application was again denied

24   and Plaintiff timely filed a request for hearing on December 18, 2003.  AR at 45-47.  Plaintiff, his

25   attorney, an interpreter, a Medical Expert, and a Vocational Expert appeared at a hearing before

26   _____

27        [1]  Michael J. Astrue was sworn in as Commissioner of Social Security on February 12, 2007.
     Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, he is automatically substituted as
28   Defendant for the previous Commissioner, Jo Anne Barnhart.

Administrative Law Judge ("ALJ") Michael Blume on September 30, 2004.  AR at 272-292.  In a decision dated December 14, 2004, the ALJ found that Plaintiff was not disabled.  AR at 14-23. Plaintiff requested administrative review, and the Appeals Council denied this request on October 12, 2005, making the ALJ's decision the final decision of the Commissioner.  AR at 6-13.

Plaintiff filed a motion for summary judgment pursuant to 42 U.S.C. § 405(g).  The Commissioner responded with a cross-motion for summary judgment.  The parties have consented to the jurisdiction of the undersigned magistrate judge pursuant to 28 U.S.C. § 636(c).

## II.        BACKGROUND

### A.        Plaintiff's Background

Plaintiff was 55 years old at the time of his administrative hearing.  AR at 65.  He was born and raised in Vietnam.  AR at 184, 190, 204.  He completed the ninth grade.  AR at 79, 184.  He speaks, reads, and writes Vietnamese fluently and has a rudimentary understanding of Cambodian. AR at 72, 184, 204, 262.  While in Vietnam, Plaintiff was a monk for 10 years.  AR at 190, 204.  He was imprisoned by the communist regime between 1977 and 1981 and was subjected to psychological torture during that time.  AR at 190, 199.  Plaintiff  immigrated to the United States in 1985.  AR at 190.  He now lives with his wife and four children.  AR  at 63, 184, 190, 199, 204.  He has worked at several jobs since arriving in the United States.  AR at 74, 101-105.  In the mid-to-late 1980's, approximately between 1985-1988, Plaintiff worked as a janitor and then as a book packer. AR at 74, 101, 104, 105.  He again worked as a janitor for a few months in 1990.  AR at 74, 101,103.  Most recently, between 2000 and 2001, he cleaned homes after hardwood floors had been installed; his duties included carrying equipment between the company vehicles and the client homes.  AR at 74, 101-102.

**United States District Court**
For the Northern District of California

### 1.      Welfare Sanctions and Arrest

Sometime around July 2000,[2] Plaintiff was sanctioned for failing to report earned income to the Alameda County welfare department.  AR at 154.  Subsequently, Plaintiff was arrested for welfare fraud, apparently on the same basis.[3]  AR at 156.  According to one account in the record, "the SSA asked Mr. Danh to come in for an appointment.  During that appointment, an official escorted him to the police station.  He was arrested there and had to sign paperwork that someone else completed.  He could not read or understand English, and there was no interpreter present.  He was detained in a locked room with strangers.  He was charged with welfare fraud for $4,000.00 in cash aid and $3,000.00 in food stamps."  *Id.*  Plaintiff reported that following his arrest for welfare fraud, he experienced panic attacks, flashbacks to his experiences in Vietnam, insomnia, irritability, and severe headaches, causing him to stop working. AR at 201, 277-278.

On August 2, 2002, the County lifted the sanction, conceding agency error.  AR at 154.  In the Conditional Withdrawal of Request for Hearing, signed by both Plaintiff and the County, the error was described as follows:

> [Plaintiff] requested written communication in Cambodian, but received it in English. [He] did not understand the employment services letters (which led to [his] sanction), nor [his] reporting responsibilities regarding [his] earnings (which led to the [overpayment] and [overissuance], as the CW7 [income reporting form] and Rights & Responsibilities were in English.  Employment Services helped [Plaintiff] get the job and knew that [he] was employed.

---

[2]  The Court notes that the record is inconsistent as to exactly when the sanction was imposed. While the Conditional Withdrawal of Request for Hearing seems to indicate that the sanction was imposed on July 1, 2000, AR at 154, another document in the record states that the sanction was imposed in December 1999.  *See* AR at 156.  Given that Plaintiff was not working between 1990 and early 2000, the Court concludes that the former date is more likely correct.

[3]  Again, the record is unclear as to when this occurred.  The arrest appears to have occurred in January 2002.  *See* AR at 65 (onset date listed as 1/15/02), 115 (investigative report by Office of Investigator General referring to arrest warrant for welfare fraud in 2002).

United States District Court

For the Northern District of California

AR at 154.  The County agreed to allow Plaintiff to repay the overissuance through reductions in his cash assistance payments and his allotments of food stamps.  AR at 154.  The criminal charges for welfare fraud were dismissed on November 6, 2002.  AR at 268.[4]

### 2.    Daily Activities Questionnaire

On August 27, 2003, Plaintiff filled out a Daily Activities Questionnaire.  AR at 138-143.  In the questionnaire, Plaintiff described his average day as follows: "I help get the kids ready for school, but not this summer.  I try to take a walk (3-4 blocks) then come home and eat.  Then I usually relax + take my medicine, which helps me sleep."  AR at 138.  In response to a question regarding difficulties sleeping, the Plaintiff stated "I can't sleep until 1 a.m. then I wake up at 5 or 6 a.m.  I'm very tired since I can't sleep more than 4-5 hours/night."  *Id*.  Plaintiff stated that he takes medication to help him sleep, but he couldn't remember what type and how often.  *Id*.  With respect to his ability to care for his own personal needs, Plaintiff stated: "I can still do these things, o.k. but in cold weather I'm lazy + don't want to shower (in hot weather I have to)."  *Id*.

Plaintiff stated that his wife prepares and cooks his meals and that his cooking is limited: "I help a little with the rice – that's all I can do." AR at 139.  Similarly, Plaintiff stated that his wife does the shopping, but that Plaintiff "[tries] to help her."  *Id*.  Elsewhere in the questionnaire, Plaintiff states that he does the grocery shopping *with* his wife, stating, "we grocery shop on the weekend."  AR at 140.  With respect to household chores, Plaintiff stated, "I help do the vacuum. . . . I can't do hard things.  I really only help with the vacuum."  *Id*.  Plaintiff also reported that he has no activities or hobbies.  *Id*.  Plaintiff stated: "I watch TV sometimes.  I just watch anything; there aren't any shows I really like.  I can't remember things."  AR at 140.  And he noted that "[s]ometimes I read a Vietnamese magazine but my memory isn't good anymore." *Id*.

Under "Social Functioning," Plaintiff reported that when he goes out he drives a car, but that "I don't drive or go out that much." *Id*.  He stated that generally when he goes out, he goes to the "[g]rocery store or doctor or [takes a] short walk."  *Id*.  He also stated under "What help, if any, do you need to get out?": "I have to be feeling good to go out."  *Id*.  In response to a query about

---

[4]  This document was submitted to the Commissioner after the hearing but before the decision of the Commissioner became final and was made part of the administrative record.  AR at 10.

difficulties in getting along with "family, friends, co-workers or others," Plaintiff stated: "We sometimes have problems, so I try to avoid it." AR at 141. Plaintiff reported that he does not visit or talk to relatives on the phone. *Id.* In response to the inquiry "who is dependent upon you for care...? What assistance do you give them?" Plaintiff wrote: "My wife + I are responsible for 4 children, the youngest is 7 years old." *Id.* Plaintiff stated that he was not involved in community, church, or social groups. *Id.* Plaintiff further stated, "I've been keeping to myself for a long time." *Id.*

Under "Personal Information," Plaintiff reported that he has problems concentrating and that his memory is "poor." *Id.* Plaintiff reported that he has "a habit of moving on to other things before [he is] finished." *Id.* In response to a question about difficulties in following written or verbal instructions, Plaintiff responded: "Verbal directions – I would forget easily. Written – I could try but it would take me a very long time." *Id.* Under the question "Please explain how your condition keeps you from working," Plaintiff wrote "I wouldn't be able to concentrate + keep up the pace." *Id.*

### 3.    Office of Inspector General Report

On August 15, 2003, the state agency disability analyst referred Plaintiff for a fraud investigation on the basis that Plaintiff's wife has received SSI disability benefits since 1987 for which Plaintiff is the payee. AR at 135. Further, Plaintiff's wife reported in a February 2003 psychological exam that she is dependent on Plaintiff. AR at 135. The referral states, "[i]t appears very inconsistent for the Subject to allege severe mental problems when other evidence indicates he serves as a payee and caretaker for his wife." *Id.* The referral also notes that under the SSA Program Operations Manual System (POMS), "if other family members are receiving benefits this may be an indicator of high risk for fraud or similar fault." *Id.*

In response to the referral, the Cooperative Disability Investigations Unit of Oakland of the Office of the Inspector General conducted an investigation, culminating in a "Report of Investigation" dated September 12, 2003 (hereinafter "OIG Report"). AR at 113-119. The report is based, in large part, on an interview of Plaintiff and his wife, conducted by the investigator in Plaintiff's home on September 2, 2003. AR at 116. Although the OIG Report is not entirely clear, it

appears that the interview was conducted largely in English, with Plaintiff translating for his wife. AR at 115 ("The Subject spoke English fairly well"); 117 ("Phuong translated questions from English and Vietnamese to her in Cambodian and visa versa").  However, the investigator notes that she "requested the use of a SSA interpreter to help the Subject explain why he is no longer able to work."  AR at 117.

In the "Synopsis," the Report sets forth six "inconsistencies and indicators" which may indicate fraud with respect to Plaintiff's claim for disability benefits. AR at 114.

First, the investigator points out that Plaintiff's wife receives disability benefits, indicating a high risk of fraud under the SSA Program Operations Manual System (POMS) (as discussed in the referral).  *Id.*

Second, the investigator pointed to a statement reportedly made by Plaintiff during a mental health exam conducted by Dr. Carol Lewis-Wintrode that "Plaintiff does not handle his own money."  *Id.*  In contrast, the SSA records show that Plaintiff serves as a payee for his wife with respect to her disability benefits.  *Id.*  Further, Plaintiff told the investigator that he's "able to handle money, that he pays the household bills, and that he goes shopping." *Id.*

Third, the investigator pointed to apparent inconsistencies between Plaintiff's Daily Activities Questionnaire and statements by Plaintiff's wife in a February 23, 2003 psychiatric exam regarding who cared for whom.  AR at 115.  In particular, the investigator pointed to statements by Plaintiff's wife that she "mostly depends on her husband to prepare meals and get her children ready to be taken to school," whereas Plaintiff stated in his Daily Activities Questionnaire that "his wife does the cooking and he's barely able to help out at all."  *Id.*  The investigator also noted that while Plaintiff told an examining physician, Amrit Rajguru, that his wife had driven him to a medical examination on September 26, 2002, Plaintiff's wife had told Dr. Jasdeep Aulakh that her husband had driven her to an examination on February 23, 2003.  *Id.*

Fourth, the investigator noted that Plaintiff had been arrested for welfare fraud.  *Id.*  The investigator did not mention that the criminal charges had been dismissed or that the sanction had been withdrawn on the basis of agency error – facts of which the investigator apparently was unaware.  *Id.*

United States District Court

For the Northern District of California

Fifth, the investigator found the conduct of Plaintiff and his wife during the interview to be suspect on a number of levels.  *Id*.  The investigator noted that upon her arrival, a small child "who had apparently been left with [Plaintiff]" began to cry and that Plaintiff picked her up and carried her downstairs.  The investigator opined that Plaintiff "appeared capable of caring for the child [and] displayed no difficulty lifting and carrying the child."  *Id*.  The investigator also stated that Plaintiff "admitted that both he and his wife are capable of paying their own bills, cooking, shopping, performing household chores, and caring for their children."  *Id*.  She found that Plaintiff and his wife "appeared alert, oriented, and able to answer questions appropriately."  *Id*.  The investigator emphasized the "rather unusual basis" for Plaintiff's disability claim: "[h]e attributed his disability to the one day he spent in jail for welfare fraud."  *Id*.  She also noted that Plaintiff's wife "thought that she was allowed disability due to a hand injury, when, in fact SSA records show that she's receiving disability benefits based on a mental impairment."  *Id*.

Sixth, the investigator noted that while Plaintiff stated in the Daily Activities Questionnaire that he rarely drives, he "gave the clear impression [during the interview] that he drives regularly."  *Id*.

## B.      Plaintiff's Medical History

### 1.      Dr. Bay Dang-Vu

Plaintiff reported visiting Dr. Bay Dang-Vu some time between 1992 and 1999 for "headaches, back pain and other physical complaints."  AR at 75.  Reported treatment included "exams, medicine like Tylenol and antibiotics."  *Id*.  No medical records from these visits are in the administrative record.  The Commissioner's request for medical records for this time period was returned from Dr. Dang-Vu with a checked box that states "This request is being returned.  I do not have the information requested." AR at 172.  Subsequently, Plaintiff's counsel tracked down Dr. Dang-Vu's records from a later time period (discussed below), but was told that records older than 7 years were shredded, and older than 3 years required a $75.00 fee to retrieve -- Plaintiff apparently declined to pay this fee.  AR at 246.

On October 3, 2002, Dr. Bay Dang-Vu examined or interviewed Plaintiff.  AR at 254 - 257.  The report is difficult to decipher, although the doctor appears to have written the word "headache."

7

United States District Court
For the Northern District of California

1   AR at 257.  On December 12, 2003, and April 30, 2004,  Dr. Bay Dang-Vu examined or interviewed

2   Plaintiff.  AR at 258.  The reports are illegible.[5]  *Id.*

### 2. Dr. Amit Rajguru – Internal Medicine Consultative Examination

On September 26, 2002, at the request of the Commissioner, Dr. Amit Rajguru performed an

Internal Medicine Consultative Examination with Visual Acuity Test on Plaintiff.  AR at 177-181.

"Back pain" was listed as the Plaintiff's chief complaint.  AR at 177.  Dr. Rajguru also noted under

"History of Present Illness" that Plaintiff  "has not seen a physician for either his back pain or his

dizziness but he also has a history of depression in the past." AR at 177-178.  Under "Impression"

Dr. Rajguru stated, "[p]atient is a 53-year-old Asian male with history of low back pain and

dizziness both of unclear etiology." AR at 180.  Under "Functional Assessment" Dr. Rajguru stated,

"[b]ased on my evaluation, the patient has no functional limitations at this time." AR at 180.  Dr.

Rajguru referred Plaintiff to Dr. Richard Keene, of La Clinica, who performed a radiology report of

the cervical spine, which revealed "[n]o significant findings."  AR at 174.

### 3. Non-Examining State Consultants

Four different state agency medical consultants reviewed Plaintiff's case.  Dr. Tysell (AR at

209-211) and Dr. Norbeck (AR at 212-229) reviewed the case during the first determination period.

Dr. Gragg (AR at 241) reviewed the case upon reconsideration and Dr. Krelstein (AR at 240)

reviewed the case during the reopening of reconsideration.  Following are summaries of their

findings.

A Consultation Request from the State Department of Disability Services ("DDS") dated

November 27, 2002, included a MC Eval [Medical Consultant Evaluation] from Dr. J. Tysell.  AR at

209-211.  The report found "no abnormal physical finding" and "no physical MDI [Medically

Determinable Impairment]."  AR at 210.  Dr. Tysell rendered the determination that the "evidence in

the file does not establish the presence of an MDI." AR at 211.  In making his decision, Dr. Tysell

---

[5] These records were not reviewed by the ALJ as they were first made available on March 21,
2005, when they were included with the Plaintiff's letter to the Social Security Administration Appeals
Council.  AR at 245.  The Appeals Council denied Plaintiff's request for review, but considered these
documents and made them part of the record.  AR at 7, 10

United States District Court

For the Northern District of California

1   considered Dr. Rajguru's September 26, 2002 examination and noted that the treating physician

2   listed (Dr. Bay Dang-Vu) had responded to the Agency's request for records by stating that he had

3   no information.  AR at 210.

4            On January 10, 2003, DDS medical consultant Dr. George P. Norbeck completed a

5   Psychiatric Report and a Mental Residual Function Report based on review of Plaintiff's file.  AR at

6   212-229.  The residual functional capacity assessment found that Plaintiff had a marked limitation in

7   understanding, remembering and carrying-out detailed instructions.  AR 226-227.  It also noted

8   moderate limitations in: maintaining attention and concentration for extended periods; the ability to

9   work cooperatively with others without distraction; the ability to complete a normal workweek

10  without interruptions from psychologically based symptoms; responding appropriately to

11  supervisors; in responding appropriately to changes in the workplace; and ability to set realistic

12  goals or make plans independently of others.  *Id*.  Dr. Norbeck "reviewed MEOR [Medical Evidence

13  of Record] and agreed with the DEA [Disability Employment Advisor] psych history summary"

14  (referencing above summary of Dr. Lewis-Wintrode's December 3, 2002 examination) and

15  summarized: "52 y/o with above diagnosis, capable of [simple repetitive tasks]."  AR at 231.  Dr.

16  Norbeck also noted under "Credibility" that "Patient has a history of welfare fraud" and under

17  "Discrepancies" "no discrepancies in psych exam." *Id*.

18           On July 11, 2003, DDS Doctor T.M. Gragg recommended that the Commissioner  "affirm

19  the decision of 1/10/03," that is, Dr. Norbeck's assessment that led to the denial of SSI benefits on

20  January 16, 2003.  AR at 241.

21           On October 23, 2003, Dr. Murray Krelstein of DDS recommended affirming the prior denial

22  of benefits "despite the new evidence." AR at 240.  "New evidence" appears to refer to the

23  information provided in Dr. Inoue's August 26, 2003 report.  AR at 189-193.  Dr. Krelstein's report,

24  which spanned from 7/11/2003 to 10/23/2003, also noted that Plaintiff "did not seek [treatment] for

25  problem until 5/16/03 some months [after] initial denial," that Plaintiff "reported an arrest for

26  welfare fraud," and that the "CDI report points up several inconsistencies in evidence…. Apparently

27  based on these inconsistencies the claimant's credibility is only partial."  AR at 240.

28

**United States District Court**
For the Northern District of California

#### 4.   Dr. Lewis-Wintrode – Consultant Medical Examiner

On December 3, 2002, Dr. Carol L. Lewis-Wintrode, Ph.D., performed a consultative psychological exam of Plaintiff on behalf of the Commissioner. AR at 182-188. The report states under "Present Illnesses": "The claimant reports that his most disabling condition is that he is emotionally depressed and that he cannot sleep. He said it affects his ability to work because 'I'm tired.' The claimant complains of memory and concentration problems. He states he forgets things." AR at 184. Under a heading entitled "Financial," Dr. Lewis-Wintrode stated: "[t]he claimant understands U.S. currency, but does not handle his own money." AR at 185. The report also stated that the following tests were administered: TONI-III; Bender-Gestalt; Beck Depression Inventory; Rey Memory Test-II. AR at 183. Under "General Observations" Dr. Lewis-Wintrode stated "the testing is considered moderately valid." *Id*. Under "Diagnostic Impressions," Dr. Lewis-Wintrode concluded that: "[g]iven the test results, the claimant is diagnosed with post-traumatic stress disorder and secondary depression, related to his experiences in Vietnam." AR at 188. She assigned Plaintiff a GAF (Global Assessment of Functioning) of 60. AR at 187. Dr Lewis-Wintrode stated:

> Prognostic Impressions: The claimant can avoid simple hazards. He is able to interact adequately with others as evidenced by his interaction with the examiner and clinic personnel. Psychologically, the claimant would have mild difficulties persisting independently at work-related activities due to emotional interference that decreases his motivation, attention, and concentration. The claimant can follow one- and two-part instructions. The claimant can handle simple tasks. The claimant would probably have difficulty handling ordinary job stresses and interacting with others on a daily basis.

> Capability: The claimant understands the value of money, but may need support in handling his funds.

AR at 188.

Dr. Lewis-Wintrode's December 3, 2002 psychological examination of Plaintiff was summarized in an undated DSS consultation request. AR at 230-231. The summary states: "Clmt [complains of] depression, memory, conc probl, poor sleep. Experienced trauma in conc camp in Vietnam. Denies A/V halluc, . . . Admits to arrest for welfare fraud, but no report of curr legal probl. ADLs appear normal. Able to travel alone. No meds. Oriented in all dimensions. No

**United States District Court**
For the Northern District of California

1   psychomotor retardation.  Mood was dysphoric & affect tense.  Insight, judgment, fund of

2   knowledge, memory all intact.  IQ 60 on Toni, severely depressed on Beck, normal results on

3   Bender & Ray.  MSS: able to do SRTs. [Simple Repetitive Tasks] (Wintrode Phd).” *Id.*

**5.      Dr. Sachi Inoue – Treating Doctor**

5          Dr. Sachi Inoue, Ph.D., of Asian Community Mental Health began treating Plaintiff on May

6   14, 2003.  AR at 208.  Dr. Inoue’s treatment continued until at least September 23, 2004, which is

7   the date of the last report from Dr. Inoue in the record.  AR at 244.  Five reports from Dr. Inoue are

8   in the administrative record; three were before the ALJ and two were presented to the Appeals

9   Council.  They are summarized below.

10          Initially, Dr. Inoue declined a request by the State Agency to comment on Plaintiff’s

11   condition.  In a May 16, 2003 letter to DSS, Dr. Inoue wrote: “I am unable to make a statement

12   about his vocational functioning at this point in time.  This is because I do not have sufficient

13   information to determine his functioning as I just opened his case on this Wednesday 5/14/03.  After

14   I obtain enough information through our services, I could provide you with my professional

15   opinion.” AR at 208.

16          Subsequently, on May 27, 2003,  Dr. Sachi Inoue completed an Initial Assessment Summary

17   and Treatment Plan for Plaintiff.  AR at 201-208.  Under “Reason for Treatment” Dr. Inoue stated:

18   “Client was referred by Homeless Action Center.  He has panic attacks, insomnia, irritability, and

19   severe headaches for the past year.  Because of these symptoms he is unable to work.”  AR at 201.

20   Under “Clinical Disorders” Dr. Inoue listed: “Anxiety Disorder,” “ Postraumatic Stress Disorder,”

21   and “Panic Disorder w/o Agoraphobia.” AR at 207.  Under the heading “General Medical

22   Conditions,” Dr. Inoue listed the following: “Chronic and severe headaches, insomnia, poor

23   concentration, poor memory.”  *Id.*

24          In a July 16, 2003 State Agency mental health assessment, Dr. Inoue described Plaintiff’s

25   “Present Daily Activities,” “Social Functioning” and “Task Completion” and concluded under

26   “Adaptation to Work or Work-Like Situations”: “I believe that Client is unable to tolerate work

27   related stress at this point in time.  The level of depression is severe, an elevation of stress would

28

11

1  cause a serious deterioration in his functioning.  Currently he is not in a mental condition that he

2  could learn new information, make sound decisions, or effectively work with co-workers."  AR at

3  197.

4        On August 26, 2003, Dr. Inoue filled out a mental disorder questionnaire detailing her

5  findings based on examinations of the Plaintiff that occurred an average of twice a month between

6  May 14, 2003, and July 1, 2003.  AR at 189-193.  Dr. Inoue diagnosed Plaintiff with "Major

7  Depressive Disorder, Recurrent, Severe without psychotic features [] Posttraumatic Stress Disorder,

8  Chronic."  AR at 193.  Dr. Inoue observed under "Affective Status" that "Client presents with

9  symptoms of Major Depressive Disorder including depressed mood, poor concentration, insomnia,

10  hopelessness, poor appetite, and worthlessness that cause impairments in his vocational and

11  interpersonal functioning.  He also presents with symptoms of PTSD including intrusive thoughts

12  and nightmares, hypervigilance, startle responses to war-related stimuli.  He sometimes experiences

13  panic attacks, but his current symptoms do not meet the criteria of Panic Disorder at this point."  AR

14  at 191.  Under current medication, Dr. Inoue stated: "Lexapro 10mg and Benadryl 50mg.  Client has

15  been compliant and responds well to the current dosage.  These medications have been prescribed by

16  Dr. Paul Yang at ACMHS."  AR at 193.  Dr. Inoue assigned Plaintiff an Axis V, or GAF score, of

17  31.  AR at 193.

18        Plaintiff provided the medical records described below to the Appeals Council as new

19  evidence on March 21, 2005.  AR at 245.  The Appeals Council denied Plaintiff's request for review,

20  but considered these documents and made them part of the record.  AR at 7, 10.

21        On February 27, 2004, Dr. Inoue filled out a "DSM-TV Multiaxial Diagnostic

22  Evaluation/Initial Assessment Summary/Treatment Plan" for Plaintiff.  AR at 263-266.  The first

23  page of the report was identical to that completed on May 27, 2003 (AR at 207) and described

24  above. AR at 263.  A detailed treatment plan was signed on July 30, 2004 by Plaintiff and three

25  doctors; one of the signatures is illegible and the other two appear to be Drs. Yang and Inoue.  AR at

26  266.  The report details the Plaintiff's symptoms and the plan to management them.  AR at 264-266.

27        On September 23, 2004, Dr. Inoue wrote a letter to Plaintiff's representative.  AR at 244.  In

28  the letter, Dr. Inoue stated:

United States District Court

For the Northern District of California

Mr. Danh has been compliant with mental health treatment at Asian
Community Mental Health Services.  My colleagues, Mr. William
Quan and Dr. Paul Yang, and I have provided individual
psychotherapy, medication management, and case management since
May 14, 2003.  Currently Dr. Yang prescribes Lexapro 10 mg and
Trazadone 50 mg.  Because of the chronicity and severity of his
mental illnesses, the treatment progress has been very slow while his
insomnia has been somewhat alleviated with medications.  Mr. Danh
continues to suffer from Major Depressive Disorder, Recurrent, Severe
and Posttraumatic Stress Disorder, Chronic (PTSD).  His symptoms
include depressed mood, poor concentration, hopelessness, low
physical energy, insomnia, hypervigilance, intrusive thoughts,
flashbacks and nightmares about the war in Vietnam.  These
symptoms are accompanied with severe headaches and knee pain.
Mr. Danh witnessed killing and atrocities during the war in the late
1970s, and since then he has suffered from PTSD.  He began
experiencing symptoms of depression shortly after immigrating to the
US in 1985 due to acculturation problems as a monolingual refugee.  I
believe that Mr. Danh continues to be impaired in vocational
functioning.  He is unable to understand and follow complex
instructions due to his poor concentration, intrusive thoughts and
flashbacks.  His profound hopelessness, depressed mood, and low
physical energy may make it hard for him to interact with co-workers
and supervisors effectively.   It would be too overwhelming for Mr.
Danh to successfully cope with work-related stress and adapt to a new
environment.

AR at 244.

### 6.    Dr. Yang

On June 19, 2003, Dr. Yang of Asian Community Mental Health Services, wrote in his
"Physician's Initial Note" under "Clinical Impressions:" "Presented: Depression and P.T.S.D."  AR
at 200.  Under "History of Present Illness" Dr. Yang wrote: "He is still experiencing nightmares and
flashbacks, occurring 1-2x / week.  He reports multiple depression [symptoms] including feeling
unhappy, [loss of] appetite, sleeps 3 hours per night, feeling low energy, worthlessness.
[unintelligible].  He denies psychotic [symptoms].  He is minimally functioning."  AR at 199.

An undated medication report from Asian Community Mental Health Services indicates that
Dr. Yang prescribed the Plaintiff medicine ten times between June 19, 2003, and August 19, 2004.
AR at 243.  The drugs prescribed include Trazadone, Lexapro, and Benadryl.  *Id*.

### 7.     Other Records from Asian Community Mental Health Services

On January 28, 2005, someone from Asian Community Mental Health Services[6] completed an Annual Community Functioning Evaluation. AR at 262.  The report evaluated the Plaintiff's "Health," "Living Arrangement," "Daily Activities/Self-Care," "Social Relationships," and "Symptom Management." AR at 261-262.  The report states, "Client usually has difficulties in enjoying pleasurable activities due to the reported PTSD symptoms and depression.  He does limited household chores due to somatic pain.  He usually feels dull and fatigues easily." AR at 261.  The report also notes:  "The client continues to report suffering from chronic PTSD, panic attacks 1-2x per week, (nightmares, insomnia, headache, intrusive thoughts) and depressive mood: however he is compliant with taking psychotropic medicines." AR at 262.

### C.     Administrative Hearing

Plaintiff, his attorney, an interpreter, a Non-Examining Medical Expert and a Vocational Expert appeared at a hearing before an ALJ on September 30, 2004.  AR at 272-292.  The Medical Expert and the Vocational Expert appeared by telephone.  AR at 272.

### 1.     Non-Examining Medical Expert's Testimony

Dr. Tamehaus's testimony was based on his review of Plaintiff's record.  AR at 280.  He had not examined or treated Plaintiff.  Dr. Tamehaus expressed the opinion that Plaintiff's symptoms, as he had reported them to the doctors who examined and treated him, indicated a diagnosis of "depression and anxiety and post-traumatic stress disorder" of sufficient severity to warrant the award of disability benefits.  *Id*.  Dr. Tamehaus went on, however to state that it was "not clear" that Plaintiff had been candid with his doctors.  In support of this opinion, Dr. Tamehaus pointed to the OIG report.  When asked whether he found Plaintiff's story credible, Dr. Tamehaus stated, "I don't believe it.  There are too many inconsistencies in what was seen  – what was represented to be true." AR at 281.

In response to Dr. Tamehaus's testimony, the ALJ asked him if he believed Plaintiff could have deceived Dr. Inoue for the entire year and a half during which he received treatment.  AR at

---

[6] The signature on the document is not legible.

United States District Court

For the Northern District of California

282. The transcript indicates that Dr. Tamehaus's response was partially inaudible. AR at 282. Dr. Tamehaus did testify, however, that he had "clients who in [his] practice have deceived [him] willingly and sometimes unwillingly." AR at 282. Next, the ALJ asked Dr. Tamehaus if it would be "unusual for Post-Traumatic Stress Disorder to be triggered by an experience like the claimant had," presumably referring to Plaintiff's arrest for welfare fraud. AR at 282. Dr. Tamhaus testified that it would not be unusual and that "one of the criteria for the diagnosis [is] to have memories of the past [that are] triggered by more current events which are similar or symbolic of the original trauma." AR at 282.

In response to a question by Plaintiff's attorney, Dr. Tamehaus testified that if he were to credit the reports of the examining and treating physicians, he would conclude that Plaintiff met a Listing for disability on the basis of Post-Traumatic Stress Disorder. AR at 284-285. He also testified that if Plaintiff and his wife shared the household responsibilities, that would not be inconsistent with a diagnosis of Post-Traumatic Stress Disorder. AR at 284.

### 2.    Plaintiff's Testimony

The ALJ questioned Plaintiff about his education, work history and daily activities.[7] AR at 275-279. Plaintiff testified that he stopped working when his mental health deteriorated, after he was arrested for welfare fraud. AR at 276. Plaintiff stated that his arrest for welfare fraud brought back memories of his imprisonment in Vietnam, causing him to be unable to sleep every two to three nights. AR at 277. He testified further that he takes medication to help him sleep. AR at 278.

The ALJ then questioned Plaintiff about his reported statement to Dr. Lewis-Wintrode that he does not handle money and the apparent inconsistency of this statement with the fact that he is his wife's payee on her disability. The following exchange occurred:

Q:     Okay, Okay. Now, you are your wife's representative payee, is that right?

A:     Yes.

_____

[7] A translator was present and apparently was translating for Plaintiff and the ALJ. It appears that the translator may not have translated verbatim, at least initially, but rather, summarized Plaintiff's answers. *See* AR at 276. The ALJ then admonished the translator that he was to translate "exactly what [Plaintiff] says. AR at 277.

**United States District Court**
For the Northern District of California

| | |
|---|---|
| 1 | Q:   Okay. But when you went to an examination with a psychologist that Social Security sent |
| 2 | you to, you told the psychologist that you were dependent on your wife? |
| 3 | A:   No, sir. |
| 4 | Q:   You didn't say that? |
| 5 | A:   No, sir. |
| 6 | Later, the ALJ asked Plaintiff again about his handling of the family finances.  Plaintiff stated, "I |
| 7 | and my wife, you know, handle the money together."  AR at 278 |
| 8 |        The ALJ questioned Plaintiff regarding who does the driving and the cooking in the family: |
| 9 | Q:   Okay.  You also told the – a doctor that Social Security sent you to that your wife drove you |
| 10 | to the appointment? |
| 11 | A:   Yes, sometimes if I feel good I drove. And if not, you know, I ask my wife. |
| 12 | Q:   Okay.  All right.  Who does the cooking? |
| 13 | A:   Sometime I was helping her cooking. |
| 14 | Q:   Okay.  She apparently told Social Security that you do the cooking. |
| 15 | A:   Both myself and my wife cooking. |
| 16 | Q:   Okay.  Who gets the kids ready for school? |
| 17 | A:   Myself and my wife.  It depend. |
| 18 | Q:   Okay.  Your wife said you mostly do that. |
| 19 | A:   Yes, sometime I did it because, you know, my wife stay at home to do something else. |
| 20 | AR at 279.  With respect to driving, Plaintiff testified that he drives when he needs to go to the |
| 21 | grocery store, and that in the past week, he had driven five or six times.  AR at 289. |

**3.   Testimony of Vocational Expert**

The ALJ posed the following hypothetical to the VE:

> If I have an individual approaching advanced age who speaks little or
> no English and is illiterate in English with the same past work as the
> claimant, who has no physical limitations, but who has marked
> limitation in understanding and implementing detailed instructions,
> moderate limitations in responding appropriately to supervisors, co-
> workers and the public, moderate limitations in adapting to changes in
> the workplace, and moderate limitations completing a normal work
> week, would that hypothetical person be able to do any of the
> claimant's past work?

16

AR at 291.  The VE responded that such a person would not be able to do his past work, and further, "would not be able to work in the competitive marketplace."  AR at 291.

### D.     The  ALJ's Findings of Fact

#### 1.     The Five-Step Analysis

The Social Security Act provides disability insurance benefits when a claimant is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or is expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  A claimant is disabled:

> only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives.

*Id.*

The Commissioner has established a sequential five-step evaluation process to determine whether a claimant is disabled under the Social Security Act.  20 C.F.R. § 404.1520(a).  If the Commissioner can determine that the claimant is conclusively disabled or not disabled at a step, the Commissioner does not proceed to the next step.  20 C.F.R. § 404.1520(a)(4).  Otherwise, the Commissioner proceeds to the next step.  The claimant bears the burden of proving his disability in Steps One through Four.  *See Gomez v. Chater*, 74 F.3d 967, 970 (9th Cir. 1996).  At Step Five, the burden shifts to the Commissioner to prove that the claimant can perform other work.  *See Distasio v. Shalala,* 47 F.3d 348, 349 (9th Cir. 1995).

At Step One, the Commissioner considers the claimant's work activity.  20 C.F.R. § 404.1520(a)(I).  If the claimant is doing "substantial gainful activity," the claimant is found to be not disabled.  *Id.*  If the claimant is not doing substantial gainful activity, the evaluation proceeds to Step Two.  *Id.*

At Step Two, the Commissioner considers whether the claimant has a "severe medically determinable physical or mental impairment" or combination of such impairments that has lasted or is expected to last more than 12 months.  20 C.F.R. § 404.1520(a)(ii).  An impairment is severe if it "significantly limits [the claimant's] physical or mental ability to do basic work activities."  20

United States District Court

For the Northern District of California

C.F.R. § 404.1520(c).  "[T]he step two inquiry is a de minimis screening device to dispose of groundless claims." *Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir.1996) (citing *Bowen v. Yuckert* 482 U.S. 137 at 153-54 (1987).)  "A claim may be denied at step two only if the evidence shows that the individual's impairments, when considered in combination, are not medically severe, i.e., do not have more than a minimal effect on the person's physical or mental ability(ies) to perform basic work activities.  If such a finding is not clearly established by medical evidence, however, adjudication must continue through the sequential evaluation process." SSR 85-28.

At Step Three, the Commissioner compares the claimant's impairments with a list of impairments that the Commissioner has determined are disabling ("Appendix 1"). 20 C.F.R. § 404.1520(a)(iii).  If the claimant's impairment(s) meets or equals in severity an item on the list, and this impairment(s) meets the duration requirement, the claimant is disabled. *Id.*  Otherwise, the Commissioner proceeds to Step Four. *Id.*

At Step Four, the Commissioner considers the claimant's Residual Functional Capacity ("RFC"). 20 C.F.R. § 404.1520(a)(iv).  A claimant's RFC is the most the claimant can do in light of the physical and/or mental limitations caused by the impairment(s). 20 C.F.R. § 404.1545.  If the claimant can perform his past relevant work, he is not disabled. *Id.*  Past relevant work is work the claimant has done in the 15 months prior to the evaluation that was substantial gainful activity and that lasted long enough for the claimant to learn to do it. 20 C.F.R. § 404.1560(b)(I).  If the claimant cannot perform his past relevant work, the evaluation proceeds to Step Five. *Id.* § 404.1545.

At Step Five, the Commissioner considers whether the claimant, in light of his RFC, age, education, and work experience, can make an adjustment to "other work" in the national economy. 20 C.F.R. § 404.1520(a)(v).  If the claimant can make an adjustment to other work, he is not disabled. 20 C.F.R. 404.1520(a)(v).  However, if the claimant cannot make an adjustment to other work, he is disabled and eligible for disability benefits. *Id.*

## 2.    The ALJ's Findings

At Step One, the ALJ in this case found that Plaintiff had not engaged in any substantial gainful activity since the onset of his alleged disability, and thus a finding of disability was not precluded on the basis of work history. AR at 20.

**United States District Court**
For the Northern District of California

At Step Two, the ALJ found the Plaintiff to lack credibility and thus determined that "the claimant is 'not disabled' within the meaning of the Social Security Act . . . ." *Id*.  The ALJ stated: "Based on his subjective allegations, one could conclude that the claimant suffers from a mental impairment.  However, because of his clear intent to deceive by repeatedly misrepresenting his daily activities, I cannot accept his subjective allegations." AR at 22.  The ALJ also stated: "While I normally afford the opinion of a treating physician great weight, I do not find the opinions of Dr. Inoue persuasive in this case, as the investigatory report raises serious questions about the claimant's credibility, including the credibility of his allegations of mental impairment."  AR at 21.  The ALJ thus concluded that Plaintiff "fails to describe any 'severe' impairment or combination of impairments, that is, any impairment having more than a minimal effect on the claimant's ability to perform basic work activities." AR at 22.

In his decision, the ALJ cited several inconsistencies which apparently informed his credibility determination.  The first was related to money management: "[Claimant] told the psychological consultative examiner in December, 2002 that he did not handle his own money . . . However, according to Administrative records, he has been designated as the payee for his wife's benefits. . . .  The claimant was interviewed by investigator [], admitting that he was able to handle money, that he paid the household bills and went shopping, and knew the amount of his rent and the amount of cash and food stamp benefits that his family received." AR at 21.

The ALJ also recounted descriptions of the Plaintiff and his wife's division of labor:

> At the internal medicine consultative examination in September, 2002, the consultative examiner noted, no doubt based on the claimant's report, that the claimant was driven to the exam by his wife [].  In his daily activities questionnaire, the claimant indicated that his wife prepares and cooks the meals, and that he only helps a little with the rice, and that is all he can do [].  While the claimant alleges that he is dependent on his wife, the wife in turn indicated to the State Agency during her own psychological examination on February 23, 2003, as part of her application, that she is dependent upon the claimant to do different chores around the house, prepare meals, and to get the children ready to be taken to school [].  She also stated that the claimant drove her to the appointment and that she asks her family and friends to give her rides and that she was unable to manage her own money[].

AR at 21.  In this vein, the ALJ also noted: "Finally, in [claimant's] activities of daily living questionnaire, he indicated that while he obtained his driver's license ten years earlier, he did not drive or go out that much.  However, he gave the clear impression to the investigator that he drives regularly, and said that his wife and he shared the household chores and grocery shopping[]." AR at 22.

The ALJ also included the observations of the OIG investigator in his analysis, noting that she found a small child in Plaintiff's care who Plaintiff "carried downstairs to her parents' apartment without any difficulty." AR at 22.  The ALJ stated: "[Claimant] also admitted to the investigator that both he and his wife are capable of paying their own bills, cooking, shopping, performing chores and caring for their children.  They were noted as appearing alert, oriented and able to answer questions appropriately, and that he spoke English fairly well." *Id.*

The ALJ's opinion also noted the presence of a welfare fraud charge: "Also damaging to the claimant's credibility is evidence that a criminal records check confirmed that an arrest warrant was issued in 2002 for welfare fraud.  His representative stated that this was an error and was not the claimant's fault[], but she provided no court records to support this argument."  AR at 22.  Finally, the ALJ noted that claimant "has little incentive to work.  In 1988 he earned $12,000; in 1989 he earned $7,800.  He currently receives $800 per month in welfare plus food stamps and possibly a Section 8 housing subsidy without needing to work." AR at 22.

The ALJ acknowledged that his findings conflicted with the diagnoses of the treating and examining sources and cited the non-examining expert's testimony that "if one were to accept the reports of the consultative psychological examiner and the treating psychologist, one would conclude that the claimant meets the requirements of Sections 12.04 and 12.06 of the Listing of impairments." AR at 22.

### E.    Alleged Error by the ALJ

Plaintiff asserts that the ALJ's determination should be reversed for the following reasons: 1) the ALJ erred in rejecting the treating doctors' opinions without giving specific and legitimate reasons supported by substantial evidence; 2) the ALJ erred in disregarding the examining doctor's opinion without giving specific and legitimate reasons supported by substantial evidence; 3) the ALJ

United States District Court

For the Northern District of California

erred in assigning the greatest weight to the opinion of a non-examining medical expert when that opinion was unsupported, unexplained, inconsistent with the record as a whole, and did not constitute substantial evidence; 4) the ALJ erred in evaluating Plaintiff's credibility by failing to consider the entire case record and provide clear and convincing reasons: Plaintiff's mistaken arrest, daily activities and failure to seek treatment were not clear and convincing reasons; 5) the ALJ displayed bias indicating an inability to render a fair judgment; and 6) the ALJ erred in finding that Plaintiff has no severe mental impairment at Step Two.[8]

## III.    ANALYSIS

### A.    Legal Standard

When asked to review the Commissioner's decision, the Court takes as conclusive any findings of the Commissioner which are free from legal error and supported by "substantial evidence."  42 U.S.C. § 405(g).  Substantial evidence is "such evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971).  Substantial evidence means "more than a mere scintilla," *id.*, but "less than a preponderance." *Desrosiers v. Sec'y of Health and Human Servs.*, 846 F.2d 573, 576 (9th Cir.1988).  Even if the Commissioner's findings are supported by substantial evidence, they should be set aside if proper legal standards were not applied when weighing the evidence and in reaching a decision.  *Benitez v. Califano*, 573 F.2d 653, 655 (9th Cir. 1978).  In reviewing the record, the Court must consider both the evidence that supports and detracts from the Commissioner's conclusion.  *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996) (citing *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985)). The Court may not affirm the ALJ's decision "simply by isolating a specific quantum of supporting evidence."  *See Jones*, 760 F.2d at 995.  However, "[w]here evidence is susceptible to more than one rational interpretation," the ALJ's decision should be upheld.  *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005).

---

[8]  Plaintiff does not challenge the ALJ's conclusion that the Plaintiff does not suffer from a severe physical impairment based on alleged back pain.

**United States District Court**
For the Northern District of California

**B.    Credibility Determination**

The ALJ rejected the treating and examining doctors' opinions and found the Plaintiff to be "not disabled" based on his determination that the Plaintiff lacked credibility.  AR at 21.  In support of his credibility finding, in turn, the ALJ cited to the OIG report and the various alleged inconsistencies described therein.  AR at 20-21.  The Court concludes that the ALJ erred in failing to provide clear and convincing reasons based on substantial evidence in support of his credibility finding.

A claimant's credibility in a Social Security hearing is the degree to which the claimant's statements can be believed and accepted as true.  SSR 96-7p at 4.  The courts have "consistently held that 'questions of credibility and resolution of conflicts in the testimony are functions solely of the Secretary.'"  *Saelee v. Chater*, 94 F.3d 520, 522 (9th Cir. 1996) (citing *Allen v. Heckler*, 749 F.2d 577, 580 n.1 (9th Cir. 1985) (quotations omitted).)  Nonetheless, the ALJ's findings must "contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reason." SSR 96-7p at 2.  "For the ALJ to reject the claimant's complaints, she must provide 'specific, cogent reasons for the disbelief.'" *Lester v. Chater* 81 F.3d 821, 834) (9th Cir. 1995) (citing *Rashad v. Sullivan*, 903 F.2d 1229, 1231 (9th Cir. 1990)). When there is no affirmative evidence of malingering, the courts have raised this standard, mandating that the ALJ provide "clear and convincing" reasons for rejecting the Plaintiff's testimony.  *Burch v. Barnhart*, 400 F.3d 676 (9th Cir. 2005) (citation omitted); *see also O'Donnell v. Barnhart*, 318 F.3d 811, 818 (8th Cir. 2003) (holding that "clear and convincing" standard applied where evidence as a whole did not support a finding of malingering).

As a threshold matter, the Court finds that in the instant case, the record does not contain affirmative evidence of malingering. "'Malingering' is a medical term defined as the willful, deliberate, and fraudulent feigning or exaggeration of the symptoms of illness or injury." *Morales v. Apfel*, 225 F.3d 310, 313 n. 3 (3d Cir. 2000) (quoting *Dorland's Illustrated Medical Dictionary* 982 (2d ed.1994)).  Although the Court has found no case that expressly states as much, the very meaning of the word "malingering" indicates that evidence of malingering must be *medical*

22

**United States District Court**
For the Northern District of California

1   evidence, that is, the opinion of a *physician* that a claimant is exaggerating his symptoms.  Further,

2   an extensive review of the case law indicates that courts considering the issue of malingering look to

3   the *medical* evidence in the record to determine whether a claimant is malingering.  Here, none of

4   the doctors who treated or examined Plaintiff expressed the opinion that Plaintiff was exaggerating

5   any of his symptoms.

6        Nor is the testimony of the non-examining physician, Dr. Tamehaus, sufficient to support a

7   finding of malingering.  To the extent Dr. Tamehaus suggested he believed Plaintiff might be faking

8   his symptoms, he relied entirely on the OIG report.  The OIG report, however, was completed by an

9   investigator who apparently had no medical qualifications.  Further, the grounds on which the

10  investigator relied to conclude that Plaintiff might be lying about his condition did not relate to

11  Plaintiff's symptoms but rather, to his alleged welfare fraud and perceived inconsistencies in

12  statements made by Plaintiff and his wife.  The only opinion in the report that might be viewed as

13  *medical* – the investigator's skepticism that Plaintiff's arrest for welfare fraud would have triggered

14  Plaintiff's mental health symptoms – was expressly rejected by Dr. Tamehaus, who testified that

15  such an experience is consistent with a diagnosis of Post-Traumatic Stress Disorder.   Therefore, the

16  Court concludes that the "clear and convincing" standard should be applied in assessing Plaintiff's

17  credibility.[9]  That standard is not met here.

18       First, the ALJ improperly relied on Plaintiff's arrest for welfare fraud, cited in the OIG

19  Report, in support of his credibility finding.  AR at 22.  Although the ALJ acknowledged that

20  Plaintiff's counsel had represented that the arrest had been a result of agency error, he nonetheless

21  chose to consider the arrest as evidence Plaintiff was not credible because Plaintiff had not

22  submitted *court* records showing the criminal charges had been dismissed.  Yet the ALJ failed to

23  explain why he did not consider two documents in the record before him that supported the

24  representation of Plaintiff's counsel: the Conditional Withdrawal showing that the County had lifted

25  the sanction and conceded agency error (AR at 154) and a memorandum by a case worker referring

26

27       [9]  The Court notes that the ALJ did not find in his decision that Plaintiff was malingering.  Nor
    does the Commissioner argue in her brief that the lower standard should be applied based on evidence

28  of malingering.

United States District Court

For the Northern District of California

1    to dismissal of the criminal charges based on the Conditional Withdrawal (AR at 156).  In addition,

2    Plaintiff provided the court records reflecting the dismissal of the charges before the decision of the

3    Commissioner became final.  *See* AR at 268.

4         Second, the ALJ concluded that the inconsistencies noted in the OIG Report regarding

5    Plaintiff's daily activities showed a "clear intent to deceive."  AR at 22.  In particular, the ALJ

6    pointed to a number of activities with respect to which the evidence and statements of Plaintiff were,

7    according to the ALJ, inconsistent.  These included evidence and statements relating to who does the

8    chores and cooking in the household, how often Plaintiff drives, and who handles the money.  The

9    Court concludes that these perceived inconsistencies, by themselves, are not so blatant as to

10   establish a "clear intent to deceive," or to establish by clear and convincing reasons that Plaintiff's

11   testimony regarding his mental health symptoms should be disregarded.

12        On the question of who depends on whom, the OIG investigator notes that Plaintiff's wife

13   reported in a February 2003 psychological exam that "she mostly depends on her husband to prepare

14   meals and get her children ready to be taken to school" but that Plaintiff reported in his Daily

15   Activities Report that "his wife does the cooking and he's barely able to help out at all."  AR at 115.

16   In fact, a review of the two documents on which the OIG investigator relies in support of this

17   conclusion suggest that the inconsistency regarding household chores is overstated.  In particular,

18   while Plaintiff's wife expressed frustration during her psychological exam that she was dependant

19   on her husband "to do different chores around the house," AR at 130, she acknowledged that her

20   daily activities include "some light household chores" and that she "tries to help her husband with

21   some chores in the home."  AR 132.  Similarly, Plaintiff states in his Daily Activities Questionnaire

22   that he "trie[s] to help" his wife with the shopping, that he helps with the household chores by

23   vacuuming, and that he helps with food preparation by making rice.  AR at 139.  In addition,

24   consistent with the statements of his wife, he reported that he "help[s] get the kids ready for school."

25   AR at 138.  And at the hearing, Plaintiff testified that after he takes the children to school, he cleans

26   up around the house and "does some cooking."  AR at 286-287.  He also testified that the first thing

27   he does when his children come home from school is "feed them."  AR at 287.  In short, the

28   evidence in the record consistently reflects that both husband and wife participate in household

United States District Court
For the Northern District of California

1   chores and that Plaintiff stated as much in his Daily Activities Questionnaire and at the hearing.

2   While it appears that both husband and wife view themselves as dependent on each other, this

3   difference in perceptions is not sufficient to support the ALJ's finding that Plaintiff had a "clear

4   intent to deceive."[10]

5         Similarly, the alleged inconsistencies identified by the OIG investigator and the ALJ

6   regarding Plaintiff's ability to drive are not supported by the record.  According to the OIG

7   investigator, Plaintiff stated in his Daily Activities Questionnaire that he "rarely drives" but in the

8   interview he "gave the clear impression that he drives regularly."  AR at 115.  In fact, in the Daily

9   Activities Questionnaire Plaintiff did not state that he "rarely" drive but rather, that he does not drive

10   "that much" and that when he goes out, it is to the grocery store.  AR at 140.  Similarly, at the

11   hearing, Plaintiff testified that in the last week he had driven five times, each time to the grocery

12   store, and that he drives when he needs to go to the grocery store or purchase a money order.  AR at

13   289.  Plaintiff's testimony is not obviously inconsistent with the investigator's "impression" that

14   Plaintiff drives "regularly."  Further, given that neither the investigator nor Plaintiff provided any

15   details which would allow the ALJ or the Court to determine what "regularly" and "that much"

16   mean, it is impossible to determine whether or not there is a conflict.  As a result, the evidence and

17   testimony relating to Plaintiff's driving does not provide a "clear and convincing" reason for finding

18   that Plaintiff was not credible.

19         Regarding the handling of money, there is an apparent conflict between the statement of Dr.

20   Lewis-Wintrode that Plaintiff does not handle his own money and the fact that Plaintiff is the payee

21   on his wife's disability.  Plaintiff however, testified at the hearing that he did not tell Dr. Lewis-

22   Wintrode that he does not handle his own money.  AR at 278.  He further testified that he and his

23   wife handle the money together, and that when they need to pay bills, he purchases a money order.

24   AR at 288.  This testimony is entirely consistent with what Plaintiff told the OIG investigator.  AR at

25

26         [10]   The Court notes that to the extent the ALJ implied that the *ability* to perform household

27   chores and care for his children undermined Plaintiff's disability claim, that conclusion is not supported by the record.  In particular, at the hearing, the medical expert testified that these abilities are not

28   inconsistent with a diagnosis of PTSD.  AR at 284.

117.  In light of Plaintiff's otherwise consistent testimony that he does handle money, the ALJ's inference based on the statement in Dr. Lewis-Wintrode's report that Plaintiff showed a "clear intent to deceive" is unreasonable.  The ALJ did not seek testimony from the consulting physician to determine whether she might have been mistaken or there may have been a problem regarding translation.  Nor did he provide any reason for disbelieving Plaintiff's statement that he had not told Dr. Lewis-Wintrode that he does not handle his own money.  The conflict in the evidence and testimony regarding Plaintiff's ability to handle money is not, a "clear and convincing" reason for concluding that Plaintiff is not credible.

In sum, the Court concludes that the ALJ has not provided clear and convincing reasons supported by substantial evidence in finding that Plaintiff is not credible.

**C.    Rejection of Treating and Examining Physician Opinions**

Based on his finding that Plaintiff was not credible, the ALJ declined to credit the diagnoses or opinions of Plaintiff's treating or examining physicians, and particularly the opinions of  Dr. Lewis-Wintrode and Dr. Inoue, both of whom agreed that Plaintiff suffers from severe depression and Post-Traumatic Stress Disorder.  The Court concludes that in doing so, the ALJ erred for two reasons.  First, as discussed above, the ALJ's credibility finding was itself erroneous.  Second, even if the credibility finding were justified, the ALJ failed to address the clinical evidence in the record that supported the diagnoses of the treating and examining physicians.

An ALJ may properly reject the opinion of a treating doctor when that opinion is premised solely on the Plaintiff's subjective complaints and the Plaintiff has been discredited.  *Fair v. Bowen*, 885 F.2d 597, 606 (9th Cir. 1989) (holding that ALJ properly declined to credit opinion of treating physician where it was acknowledged that that opinion was based on "an uncritical acceptance of the claimant's own self serving accounts of his symptoms and limitations").  On the other hand, "[a] cardinal principal guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a long period of time."  *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000) (citations omitted).  Further, while the ALJ may choose to credit the conflicting opinion of a  non-treating, non-examining physician, as the ALJ did here, he "cannot

1   reject evidence for no reason or for the wrong reason." *Id.* "In choosing to reject a treating

2   physician's assessment, an ALJ may not make speculative inferences from medical reports and may

3   reject a treating physician's opinion outright only on the basis of contradictory medical evidence."

4   *Id.* (citations omitted); *see also Andrews v. Shalala*, 53 F.3d 1035 (9th Cir. 1995) (holding that when

5   "a nontreating source's opinion contradicts that of the treating physician but is not based on

6   independent clinical findings . . . the opinion of the treating physician may be rejected only if the

7   ALJ gives specific, legitimate reasons for doing so that are based on substantial evidence in the

8   record").

9         In *Morales*, the Court held that the ALJ improperly rejected the opinion of a physician who

10  had treated the plaintiff for three years for mental health problems based on his conclusion that the

11  plaintiff himself was not credible. *Id.* at 317. The Court noted, the ALJ's credibility determination

12  is not "objective medical evidence and not an acceptable basis standing alone for rejecting an

13  examining physician's conclusion." *Id.* The court further cautioned that "[t]he principal that the

14  ALJ should not substitute his lay opinion for the medical opinion of experts is especially profound in

15  a case involving a mental disability." *Id.* at 319.

16        Here, the ALJ's refusal to credit the opinion of Plaintiff's treating and examining physicians,

17  and particularly Dr. Inoue, who treated Plaintiff for a year and a half, is not based on objective

18  medical evidence. While the ALJ relied on the opinion of Dr. Tamehaus in support of his rejection

19  of Dr. Inoue's diagnosis – a diagnosis that was consistent with the opinions of all the physicians who

20  examined or treated Plaintiff – Dr. Tamehaus's opinion was based on *non-medical* evidence,

21  namely, the alleged credibility concerns identified in the OIG report. Further, although the treating

22  and examining doctors' reports were replete with test results and clinical observations supporting

23  Plaintiff's diagnosis, the ALJ did not address or question Dr. Tamehaus about them or give specific

24  reasons for rejecting this medical evidence in his decision. Further, the record does not indicate that

25  Dr. Tamehaus provided a definitive answer in response to the ALJ's question as to whether it would

26  be possible for an individual who did not suffer from Post-Traumatic Stress Disorder and depression

27  to deceive a treating physician for a year and a half.

28        The Court concludes that the ALJ improperly rejected the opinions of the treating and

1    examining physicians in concluding that Plaintiff was not disabled.

2         **D.      Appropriate Remedy**

3         "The decision whether to remand a case for additional evidence or simply to award benefits

4    is within the discretion of the court." *Reddick*, 157 F.3d at 728.  The Court has "credited evidence

5    and remanded for an award of benefits where (1) the ALJ has failed to provide legally sufficient

6    reasons for rejecting such evidence; (2) there are no outstanding issues that must be resolved before

7    a determination of disability can be made; and (3) it is clear from the record that the ALJ would be

8    required to find the claimant disabled were such evidence credited."  *Smolen v. Chater*, 80 F. 3d

9    1273 (9th Cir. 1996) (internal citations omitted.)

10        In this case, the ALJ's reasons for finding the Plaintiff to lack credibility and rejecting the

11   treating and examining doctors' opinions are legally insufficient.   There are no outstanding issues

12   that prevent the Court from determining disability.  Finally, it is clear from the record that the ALJ

13   would be required to find Plaintiff disabled if the evidence was credited.  In particular, in his

14   decision the ALJ expressly endorsed the opinion of the non-examining medical expert that if the

15   reports of the consultative psychological examiner (Dr. Lewis-Wintrode) and of the treating doctor

16   (Dr. Inoue) were credited, Plaintiff would meet a Listing and therefore would be disabled.  AR at

17   284.

18   **IV.   CONCLUSION**

19        For the reasons stated above, Plaintiff's motion for summary judgment is GRANTED.  The

20   Commissioner's cross-motion for summary judgment is DENIED.  The decision of the

21   Commissioner is REVERSED and REMANDED for determination and award of benefits.

22        IT IS SO ORDERED.

23

24   Dated: March 26, 2007

25                                                    _____

26                                                    JOSEPH C. SPERO
                                                      United States Magistrate Judge

27

28